UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE RAKOFF

---------------------------------------------------------------x

YOGENDRA SOLANKI,

          Plaintiff,

     -against-

RESEARCH INSTITUTE OF AMERICA,
 A wholly owned subsidary of
THE THOMSON CORPORATION

    ---------------------------------------------------------------x

05 CV COMPLAINT 4609

JURY TRIAL DEMANDED



    The Plaintiff hereby complains of the Defendant as follows.

## JURISDICTION

    1. The court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. The court has

supplemental jurisdiction of the state and city claims pursuant to 28 U.S.C. §1367. All

administrative prerequisites to bringing this suit have been satisfied in that plaintiff filed a

complaint based on age, race, color, national origin and retaliation discrimination with the Equal

Employment Opportunity Commission in or about October 28, 2004 and on or about February

17, 2005 he received a right to sue letter.

## PARTIES

    2. The Plaintiff Yogendra Solanki is an individual and he resides at 4 Greene Road

Tappan, New York, 10983.

    3. Mr. Solanki was born on May 19, 1945.

4. Mr. Solanki was born in India but is now an American Citizen.

5. The Research Institute of America (hereinafter "RIA") is a corporation which is, upon information and belief a corporation incorporated under the laws of the State of New York. and it is a wholly owned subsidiary business unit of The Thomson Corporation, a corporation, upon information and belief that is incorporated under the laws of the State of New York and/or is licensed to engage in business in the State of New York.

6. RIA has a principal place of business at 395 Hudson Street, New York, NY 10014. The Thomson Corporation has a principal place of business at Metro Center, One Station Place, Stamford Connecticut, 06902.

7. The RIA is a company that publishes books regarding the laws and analysis of the laws of the United States. The Thomson Corporation is, upon information and belief a corporation which is engaged in the business of publishing books.


## FACTS


8. Mr. Solanki was hired on March 21, 1973 by RIA predecessor the Prentice-Hall Corporation. He was originally hired as an editor.

9. As an editor Mr. Solanki is involved in the research and editing of tax information of the states in the United States of America.

10. Mr. Solanki continues to work as an editor at RIA.

11. From 1973 through 2000, Mr. Solanki was evaluated on a regular basis and received good to excellent evaluations. Mr. Solanki received regular raises and he was never reprimanded

2

or suspended for bad work.

12. In 2000 Mr. Solanki's immediate supervisor changed. In 2000 Mr. Solanki's immediate supervisor became Mr. Jose Curammeng.

13. Immediately after the appointment of Mr. Curammeng, Mr. Solanki became subjected to demeaning, abusive and hostile treatment from Mr. Curammeng. Mr. Curammeng's abusive demeaning and hostile treatment of Mr. Solanki included but was not limited to being archly and needlessly critical, being very disrespectful, and giving him incorrect and bad evaluations. Mr. Curammeng did not treat other similarly situated non-Indian and/or younger employees in this manner.

14. In response to Mr. Curammeng's abusive, demeaning and hostile treatment, in or about August 2000, Mr. Solanki contacted his department director, Ms. Virginia Lorenzo, and requested a transfer to a different department.

15. In or about September of 2000, Mr. Solanki's requested transfer was denied.

16. On November 21, 2000, Mr. Solanki wrote to the Human Resources Department of RIA and again requested a transfer out of Mr. Curammeng's group because of the abusive, demeaning, hostile and discriminatory treatment of Mr. Curammeng.

17. In or about January 2001 , the Human Resources Department of RIA authorized Mr. Solanki's transfer .

18. In response to Mr. Solanki going above Ms. Lorenzo in the chain of command and obtaining his transfer, Ms. Lorenzo became, upon information and belief, angry.

19. After Mr. Solanki's transfer, Ms. Lorenzo took away his office.

20. Upon information and belief all similarly situated editors at RIA were assigned an

3

office. Mr. Solanki was assigned an office in 1980, and had continually had an office from 1980 to 2001

21. All other similarly situated editors had an office.

22. Similarly situated younger and/or non-Indian employees were not treated in this manner.

23.. Mr. Solanki was put in a cubicle and his office was assigned to a much younger editor.

24. Upon information and belief other editors had requested transfers from Mr. Curammeng's group and were given transfers, but no other editor's office was then taken away.

25. In or about May 2001 Mr. Solanki was given his yearly performance evaluation.

26. In his May 2001 yearly evaluation, Mr. Solanki was given ratings of "2" which represented that he needed improvement. Said evaluation was false.

27. Upon information and belief the yearly evaluation placed Mr. Solanki in a compromised job situation because said evaluation can lead to termination.

28. In or about July of 2001, and in response to the May 2001 yearly evaluation, Mr. Solanki wrote to RIA's Human Resources Department and complained about the unfair, discriminatory and now retaliatory yearly evaluation .

29. In addition and after Mr. Solanki did not receive a response from the Human Resources Department, on or about October 26, 2001 Mr. Solanki sent a letter to Steve Zelman, Senior Vice-President of RIA in which he stated, inter alia, that his May 2001 yearly evaluation was both discriminatory and retaliatory.

30. No action was taken on Mr. Solanki's complaint of discrimination and retaliation.

4

31. When Mr. Solanki was transferred from one group to another he was told that he would have to give up his office because each group was allotted a certain number of offices.

32. In October 2003 more offices in Mr. Solanki's group became available. Mr. Solanki asked for an office now that more office were available, and again he was denied and offices were given to younger, non-Indian editors.

33. In December 2003, Mr. Solanki had a meeting with Ms. Lorenzo in which he questioned why he was being denied an office. Mr. Solanki reminded Ms. Lorenzo that she had told him that the reason he was denied an office was he had moved to a different group. In response Ms Lorenzo stated, in sum and substance, that the policy had now changed and there was no consistent policy and the decision to give an office was arbitrary and discretionary.

34. Again, no other similarly situated non-Indian and/or younger editor was treated in said manner.

35. Thereafter, on December 18, 2003 Mr. Solanki e-mailed Mr. Steve Zelman in which he stated, inter alia:

Dear Steve,
(1) Two years ago, when I was transferred from Jose Curammeng's group to Maribel Fajardo's group, Virginia Lorenzo, in the presence of Marlene Kaminsky, told me that offices are based on the group and I will have to move from my office to a cubicle since I am moving from one group to another group. I was told that every group is allocated a certain number of offices and since I am moving from one group to another group, I had to give up my office and move to a cubicle.

(2) Recently, some extra offices opened up for our department and yet, I was not given the office although my group (Maribel) now has only 3 offices, while the other two groups (Jose and Shelia) have 5 offices each. This is very unfair distribution of the offices within the Department. I am an editor with this company for more than 30 years and my performance rating is "3". I believe the

recent distribution of offices is discriminatory and without any rational basis. I know editors in my department got offices even when their rating was "2" and while they were on probation. In fact, Virginia has given out offices by the use of the flip of a coin, without any consideration for job performance or seniority.

(3) I had a meeting with Virginia about this problem. I reminded her that two years ago she explained to me the reasons for my vacating the office and moving to into a cubicle. Her reply was : "That was then, this is now. The policy has changed and there is no consistent policy and everything is discretionary."

(4) I believe that she changed her policy just to keep me out of an office. Her policy is arbitrary, capricious, discriminatory, retaliatory and punitive. When I found out about the office, I talked to Maribel and Maribel told me that she was not consulted and it was exclusively Virginia's decision. None of the managers were consulted. Last summer, when I applied for flexible hours (FWA), Maribel had approved my application and hours , but the request was denied by Virginia. Even after Virginia denied the request, Maribel helped me change my hours and reapplied and the second request was also rejected by Virginia. When I went to talk to Maribel, she said that Virginia rejected the flexible hours request. She said I should wait for a while and then reapply. Maribel is a very fair and decent manager but Virginia's policy is arbitrary, capricious, discriminatory, retaliatory and punitive.

(5) I believe that the department, as well as the company, should have a consistent, justifiable and fair policy so employees do not feel that they are being discriminated against or humiliated or punished.

(6) I believe that I am being discriminated against, humiliated and punished for complaining against her in the past.

(7)I would like to sit down with you and discuss this matter at your convenience. The best solution is to find an office for me or build one next to Ann Forster's office instead of turning this into a big "discrimination" and humiliation" issues, which is certainly not my intent.

36. Thereafter, Mr. Solanki met with Steve Zellman in regards to his e-mail. Mr. Zellman stated, inter alia,  that Mr. Solanki should now worry about his job.

37. Thereafter, Mr. Solanki met with Mark Schlageter, the General manager and Senior Vice president of RIA and repeated his concerns regarding being discriminated and retaliated

against.

38. Mr. Schlageter failed and/or refused to take any action to correct the situation.

39. Immediately after meeting with Mr. Schlageter, Mr. Solanki was again retaliated against, this time his upper managers accused him of failing to meet specific goals. These allegations were patently false. Mr. Solanki was given thirty days to improve or he could be reprimanded including the possibility of termination.

40. In April 2004, Mr. Solanki was again given an "interim" evaluation by his supervisor Ms. Maribel Fajardo. No other similarly situated non-Indian and/or younger editor was given an "interim" review.

41. In said "interim" review Mr. Solanki received a "2". Said review was false.

42. Upon information and belief said "2" rating was motivated at least in part by discrimination and retaliation.

43. In or about May 12, 2004, Mr. Solanki met with Ms. Marlene Kaminsky, Director of Human Resources of RIA and Mr. Solanki's immediate supervisor Ms. Maribel Fajardo.

44. During the above mentioned meeting Mr. Solanki was given a 30-day performance improvement plan, which included completion dates for his assignments which were unrealistic and which similarly situated non-Indian and/or younger editors were not given.

45. Upon information and belief, the imposition of the performance improvement plan, was motivated, at least in part by retaliation for Mr. Solanki's protected speech regarding being discriminated against.

46. As part of the above mentioned plan, Mr. Solanki was told that he would be monitored very closely and that his manager would meet with him on a bi-weekly basis. In

addition, Mr. Solanki was told that if he did not improve he would be subjected to disciplinary action including termination.

47. Upon information and belief, the performance improvement plan was extremely burdensome and created for failure since no editor, similarly situated or otherwise could satisfy the dictates of the plan. In addition no other similarly situated editor was required to comply with the outrageous requirements of said plan.

48. Over the next several weeks Mr. Solanki met with his supervisor in regards to the performance plan, and several mistakes were pointed out. During this period of time Mr. Solanki investigated the amount of work he was assigned compared to the work assigned to similarly situated editors and he determined that he was given many more assignments than similarly situated editors. In some cases Mr. Solanki was assigned double the amount of similarly situated younger editors.

49. In or about the Summer, 2004, Mr. Solanki discussed the fact that he was doing much more work then any other editor and all his supervisor responded was that the work would even out.

50. The work never evened out.

51. Upon information and belief the amount of work assigned was motivated by, at least in part discrimination and retaliation.

52. In or about June 4, 2004 Mr. Solanki's attorney sent a letter stating inter alia, that he was being discriminated and retaliated against.

53. Thereafter, Mr. Solanki's employment situation continued to deteriorate and the harassment, discrimination and hostile environment became worse. Some of the harassment, and

discrimination included but is not limited to continuing to deny him an office, isolating him, continuing to subject his work to very heightened scrutiny, threatening his employment, isolating him and subjecting him to an amount of work which is impossible to complete and to which no other similarly situated editor is subjected.

54. As a result of the continuous and continuing discrimination and retaliation, Mr. Solanki has suffered emotional damages from the increased stress and harassment.

55. On or about October 27, 2004, Mr. Solanki filed a complaint with the Equal Employment Opportunity Commission, in which he alleged discrimination based on his Race, Color, National Origin, Age and Retaliation .

56. On February 17, 2005, Mr. Solanki received a 90 day Right to Sue letter and this case is brought within 90 days of said letter.

## FIRST CAUSE OF ACTION

57. The actions and inactions of the Defendant in discriminating and retaliating against the Plaintiff based on his race and/or color and/or national origin  violated the Plaintiff's rights under 42 USC 2000e et. seq and as a result the Plaintiff has been damaged in terms of emotional harm and said acts were done intentionally, maliciously and recklessly requiring punitive damages against the defendant.

9

## SECOND CAUSE OF ACTION

58. The Plaintiff repeats and reallege paragraphs one (1) through fifty- six (56)  and restates them as paragraph fifty-eight (58).

59. The actions and inactions of the Defendants in discriminating and retaliating against the Plaintiff based on his age violated the plaintiff's rights under 29 U.S.C.§§621 to 634 and as a result the Plaintiff has been severely damaged in terms of emotional harm and said acts were done intentionally, maliciously and recklessly requiring punitive damages against the defendant.

## THIRD CAUSE OF ACTION

60. The Plaintiff repeats and reallege paragraphs one (1) through fifty-six (56) and restates them as paragraph sixty (60).

61. The actions and omissions of the defendant in discriminating and retaliating against the plaintiff based on his color and/or race and/or national origin violated the plaintiff's rights under 29 U.S.C §1981 and as a result the plaintiff has been damaged in terms of emotional harm and said acts were done intentionally, maliciously and/or recklessly requiring punitive damages against the defendant.

## FOURTH CAUSE OF ACTION

62. The Plaintiff repeats and reallege paragraphs one (1) through fifty-six (56) and

10

restates them as paragraph sixty-two (62).

63. The actions and inactions of the Defendant in discriminating and retaliating against the Plaintiff based on his age and/or race and/or color and/or national origin  violated the Plaintiff's rights under New York Human Rights Law §§296 et. seq. New York City Administrative Law §8-101 et. seq and as a result the Plaintiff has been damaged in terms of emotional harm and said acts were done intentionally, maliciously and recklessly requiring punitive damages against the defendant.

### **Wherefore, the Plaintiff demands:**

1. Front Pay, Back Pay and All Benefits;

2. Injunctive Relief;

3. Compensatory Damages;

4. Punitive Damages;

5. Interest;

6. Costs;

7. Attorney's Fees, and

8. Any other Relief this Court deems just and appropriate.

Dated: New York, New York
　　　May 9, 2005

Noah A. Kinigstein
Attorney for the Plaintiff-Solanki
315 Broadway, Suite 200
New York, NY 10007
(212) 285-9300
nakasequal@aol.com
(3326)